IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| THOMAS FLEMING, | ) | |
| | ) | |
| Plaintiff, | ) | 4:03CV3307 |
| | ) | |
| v. | ) | |
| | ) | |
| NEBRASKA DEPARTMENT OF | ) | MEMORANDUM OF DECISION |
| CORRECTIONAL SERVICES, HAROLD | ) | |
| CLARKE, FRANK HOPKINS, FRED | ) | |
| BRITTEN, MEL ROUF, DONN BEAVER, | ) | |
| DAVE GARRETT, TERESA PREDMORE, | ) | |
| ANNE TOPLEY, MIKKI KIRKPATRICK, | ) | |
| KELLY WARD, ROBERT CURRY, JOHN | ) | |
| LEDUC, and RANDY KOHL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This action, which is brought pursuant to 42 U.S.C. § 1983, is based upon allegations that the conditions of the plaintiff's confinement in Nebraska prisons amount to cruel and unusual punishment in violation of the Eighth Amendment. (See Joint Pretrial Order, filing 92, at 2-3.) A non-jury trial was held on September 25-26, 2006, and the case has been submitted to me for decision. My decision and the reasons supporting it, including the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52, are set forth below. Though I have organized many of my findings of fact under the "background" heading, additional findings of fact may be stated under subsequent headings of this memorandum.

## I.   BACKGROUND[1]

### A.   The Conditions of the Plaintiff's Confinement

At the time of trial, the plaintiff, Thomas Fleming, was a forty-five year-old man residing

---

[1]The facts set forth in this section are based upon witnesses' testimony at trial unless otherwise indicated.

1

in the Tecumseh State Correctional Institution (TSCI), which is a prison facility operated by the Nebraska Department of Correctional Services (the Department).  In February 1987, the plaintiff came into the custody of the Department when he began serving a three- to seven-year sentence for three robberies.  The plaintiff was released on parole in 1990, and he remained outside of the Department's custody for approximately nine months.  However, in early 1991 he returned to the Department's custody after he received a fifteen- to thirty-year sentence for armed robbery.

Sometime during the spring of 1991, the plaintiff was transferred from the Department's Diagnostic and Evaluation Center to the Nebraska State Penitentiary (NSP).  Upon his arrival at NSP, the plaintiff was placed in the general prison population.  The plaintiff described the living conditions in NSP's general population as follows.  Inmates had job opportunities and could participate in many different activities.  The yard was accessible for most of the day; indeed, the plaintiff testified that although some areas of the prison were restricted, an inmate could spend "as much time as you want" outside.  In addition, inmates could play sports, attend club meetings, and practice hobbies.  For example, the plaintiff testified that he was a member of a veterans' club and a stamp club, and he engaged in several hobbies, including etching, painting, and building small items such as jewelry boxes.  General population inmates could meet with visitors from outside the prison each week, and they could make phone calls and visit the canteen–where groceries and toiletries were available for purchase–every day.

On August 31, 1991, the plaintiff and four other inmates attempted to escape from NSP by commandeering a garbage truck.  The plaintiff testified that he and his companions had reason to believe that they would find the truck unoccupied and with its engine running at the time of the escape attempt.  As it happened, however, the driver of the truck, Max Fredrickson, was inside the truck when the inmates attempted to seize it.  The plaintiff forced Mr. Fredrickson to the ground, stabbed him in the back three or four times with a five-inch shank, and searched for the keys to the truck.  The plaintiff then moved into the truck and attempted to start it using keys that he obtained from Mr. Fredrickson.  Soon another inmate directed the plaintiff's attention back to Mr. Fredrickson, who had been set on fire.  Although the plaintiff testified that he did not personally burn Mr. Fredrickson or witness the ignition of the fire that burned Mr. Fredrickson, he did know that some of his companions were carrying flammable liquids, or Molotov cocktails,

2

that they intended to throw upon guards to "scare" them away from the truck.

The escape attempt failed and, based upon his role in the incident, the plaintiff was charged with attempted murder, possession of a weapon, conspiracy to commit murder, and escape.  He pleaded guilty to attempted murder and possession of a weapon, and he received an eighty-year maximum sentence.[2]  Frank Hopkins, who, at the time of trial, was the Department's Deputy Director over institutions, testified, "Short of out and out murder, I'm not aware of anything any more particularly vicious or violent [than this escape attempt]."

After the escape attempt, the plaintiff was removed from the general population and placed in administrative segregation at NSP.  The Department's Administrative Regulation No. 201.05 defines administrative segregation as "[t]he removal of an inmate from the general population for an indefinite period of time to maintain order and security within the institution." (See, e.g., Defs.' Ex. 102 at 2.)[3]  In simple terms, inmates placed in administrative segregation are confined within a special housing unit and, for security reasons, their contact with staff and other inmates is limited.  There are three varieties of administrative segregation: intensive management (IM), which is defined as "[t]he confinement of an inmate when the inmate's demonstrated behavior presents a high risk of physical danger to anyone with whom the inmate comes into contact," (Defs.' Ex. 102 at 2); administrative confinement (AC), which, according to TSCI Warden Fred Britten, is "considered a step down" from IM;[4] and protective custody, which is "[t]he confinement of an inmate for an indefinite period of time to protect the inmate from real or perceived threat of harm by others," (Defs.' Ex. 102 at 2).  After an inmate has been placed in administrative segregation, his classification status is reviewed every six months.  (See generally Defs.' Ex. 101.)  The review process proceeds in several stages.  First, a Unit Classification

---

[2]The plaintiff testified that his current tentative release date is in 2049.

[3]The regulation also distinguishes administrative segregation from disciplinary segregation, which is defined as "[t]he temporary confinement of an inmate after the inmate has been found guilty of a violation of the Code of Offenses by a disciplinary committee . . . ."  (See, e.g., Defs.' Ex. 102 at 2.)  In other words, disciplinary segregation is imposed as punishment, while administrative segregation is imposed to address security risks.

[4]The regulations define administrative confinement as "[t]he confinement of an inmate to maintain the safety, security, and good order of the institution."  (Defs.' Ex. 102 at 2.)

Committee meets with the inmate, makes a recommendation about the inmate's classification status, and prepares a document that the trial witnesses refer to as an "Addendum A."[5]  The Unit Classification Committee typically includes the unit manager of the inmate's unit, the inmate's case manager, and another unit caseworker or a corporal.  Next, the inmate's classification status is reviewed by an Institutional Classification Committee.  This committee generally consists of a unit administrator, an associate warden, and a staff member from the mental health department.  After the Institutional Classification Committee review, the inmate's case is presented to the warden of the institution for consideration.  When the warden completes his review, the inmate's case is then forwarded to a Director's Subcommittee.  The Director's Subcommittee, which comprises three mid- to upper-management employees selected from Department facilities other than the one where the inmate under review is currently housed, then conducts a hearing and presents a recommendation to the Director's Review Committee, which "[a]pproves assignment to, continuation of and removal from [IM]."[6]  Warden Britten testified that the committees' classification decisions are based upon the incident that led to the inmate's initial placement in administrative segregation, the inmate's overall history of violence, and the inmate's behavior during his time on administrative segregation.  Britten also testified that the Addendum A typically provides a "shortened verison" of this information, and he added that the inmate's file is available for the committees to review during their deliberations.

On or about February 4, 1992, the plaintiff was formally assigned to IM status, (see Defs.' Ex. 101 at 188), though it appears that he had been housed in NSP's segregation unit since the day of the escape attempt, (see id. at 186).  The plaintiff described his living conditions on IM status as follows.  He was assigned to a cell in the Control Unit at NSP that was approximately seven feet by ten feet in size.  The cell contained a metal sink, a metal toilet, and a concrete slab.

---

[5]The Addendum A is a "Reclassification Action Form," (see, e.g., Defs.'s Ex. 101 at 2), that includes a summary of the event that led to the inmate's placement in administrative segregation, the inmate's history of violence, and the inmate's more recent behavior.

[6]If a classification action does not involve an assignment to, continuation of, or removal from IM status, it appears that the Director's Subcommittee makes the final decision concerning the inmate's classification status.  (See, e.g., Defs.' Ex. 102 at 4.)

The slab was raised two and one-half feet from the floor, and it was covered by a one-inch-thick mattress. Five days per week, the plaintiff was allowed to spend one hour in a small fenced yard. He was given three fifteen-minute showers per week, two or three phone calls per week, and one hour of law library time per week. He also received three meals per day in his cell, and he could submit a canteen sheet once per week to request snack foods. He was allowed one hour of visitation time per week, but during visits he was kept in restraints–sometimes with one arm freed–and was required to speak to visitors via telephone from behind a glass barrier. His ability to communicate with other inmates was limited to yelling through vents or doors, speaking during yard time, or saying a few words in passing while moving to the law library. According to the plaintiff, IM inmates were not allowed to attend religious services, but they could listen to a religious tape recording once per week. He also testified that IM inmates were generally allowed to have certain property, including a sweatshirt, socks, t-shirts, shorts, a jumpsuit, and toiletry items. Also, unless they were subject to disciplinary sanctions, inmates could purchase a television and radio for their cells.[7]

The plaintiff testified that in the aftermath of his escape attempt, guards retaliated against him by spitting in his food, "talking bad," shaking down his cell, and slamming the metal hatch on his cell. He added that once, while he was wearing restraints after returning from a court appearance, he was beaten by a number of guards. On January 15, 1992,[8] the plaintiff complained about a guard slamming his hatch. According to the plaintiff, the guard then placed a pencil within the plaintiff's reach and dared the plaintiff to stab him with it. The plaintiff did indeed grab the pencil and stab the guard, which led to disciplinary proceedings that resulted in sixty days of disciplinary segregation and the loss of one year of non-restorable good time.[9]

_____

[7]The plaintiff testified that after he spent a few years on IM, he was able to obtain a television and radio.

[8]Note that on this date the plaintiff had not yet been formally assigned to IM status, though his classification status had been considered by the Unit Classification Committee, Institutional Review Committee, and warden. (See Defs.' Ex. 101 at 180.)

[9]The plaintiff testified that the guard suffered only a superficial injury as a result of the stabbing, but he opined that on a scale of one to ten, with ten being the most serious, this incident should be rated "seven" because striking a guard is serious in and of itself. Donn Beaver, who

During the next two years, the plaintiff received dozens of misconduct reports.  (See Defs.' Ex. 101 at 154, 162, 168, 178.)  Indeed, the plaintiff testified that for approximately two and a half years after the escape attempt, there was "hate coming toward me and I would retaliate with hate."  After approximately three years in IM, however, the plaintiff became motivated to try to change his behavior and move to AC status.  Inmates on AC at NSP were allowed to have contact visits–that is, they were neither restrained nor separated from their visitors by a glass wall–and the plaintiff was reluctant to allow his children, who began to express interest in contacting him, to see him while he was being held in restraints.

Documents in evidence do reflect that the plaintiff's behavior changed for the better beginning, approximately, in January 1994.  (See, e.g., Defs.'s Ex. 101 at 130, 137, 147.)  However, on June 28, 1995, the plaintiff was involved in a fight with another inmate.  (See id. at 124.)  The plaintiff testified that he decided to fight the inmate, who had been taunting him, in order to avoid showing weakness.  The plaintiff was not injured in the fight, but the other inmate, who was described as a "big guy" weighing 280 or 290 pounds, lost a number of teeth.  In addition, a guard fired a shot into the ground during the fight, and the ricochet struck and injured another person in the yard.  Disciplinary proceedings were held, and once again the plaintiff received sixty days of disciplinary segregation and a loss of one year of non-restorable good time.  The other inmate was not disciplined for his role in the fight; indeed, no misconduct report was filed against him.

The plaintiff did not receive any misconduct reports in the years following the 1995 fight.  (See, e.g., Defs.' Ex. 101 at 105, 113, 119, 120.)  In December 1997, the Director's Subcommittee reviewing the plaintiff's classification status recommended that the plaintiff continue on IM for another six months, but suggested that the plaintiff be considered for reclassification to AC during the next review.  (See id. at 97, 100.)  During the ensuing six months, the plaintiff received no misconduct reports, and his behavior was deemed "appropriate" by staff.  (See id. at 94.)  Nevertheless, he was returned to IM for six more months.  The

---

currently serves as the assistant superintendent at the Community Corrections Center in Lincoln, testified that sixty days of disciplinary segregation and the loss of one year of non-restorable good time are each the most severe penalties that can be imposed by a disciplinary committee.

Director's Subcommittee Report dated June 17, 1998, states, in part,

> Fleming told the Subcommittee that he had previously been told by a
> Subcommittee that if he maintained appropriate behavior, he could be placed on
> Administrative Confinement status, and removed from Intensive Management
> status.  This was verified in a previous report.  Fleming's desire to be placed on
> Administrative Confinement status is a result of his wanting to have contact visits
> with his son. . . .  Fleming states he also wants to work his way into the Porter's
> position.  He realizes he will be in segregation for several years, but at least wants
> the opportunity to visit his son and earn some money.  The Unit Manager stated
> he had discussed placement of Fleming on Administrative Confinement status
> with the Unit Administrator, but could not make a recommendation for such at
> this time.

(Defs.' Ex. 101 at 95.)

The next review of the plaintiff's classification status began in November 1998.  (See
Defs.' Ex. 101 at 83.)  A "Segregation Status Review Sheet" dated November 10, 1998, indicates
that the members of the "Segregation Status Review Committee" all agreed that "[d]ue to
extended appropriate behavior in the Control Unit . . . [the plaintiff should be] remov[ed] from
Intensive Management and place[d] on Administrative Confinement Status with review in 6
months."  (Id. at 87.)  However, comments appearing on the "Classification Action Form" that
was prepared by the chairman of the "Segregation Status Review Committee" on November 18,
1998, state, "Due to seriousness of event that led to placement in segregation . . . recommend
continuation of Intensive Management with review in 6 months."  (Id. at 83.)[10]  The Director's
Subcommittee Report, which is dated December 17, 1998, states,

> It was noted staff recommended Fleming remain on Intensive Management
> status, with review in six months.  Fleming stated that a year ago he was told to
> keep up his good behavior and he would be considered for Administrative
> Confinement status.  Then six months ago he was told unless staff recommended
> him for Administrative Confinement status, he would stay on Intensive
> Management status.  Fleming stated he had been in segregation since 1991, and
> admits his behavior leading to Intensive Management was wrong.  He feels,
> however, that he has had three years of good behavior, and does not know what
> else he can do.  He noted unit staff recommended he be removed from Intensive
> Management, and placed on Administrative Confinement.

---

[10]This same pattern of seemingly contradictory recommendations reappears in subsequent
reviews.  (See, e.g., Defs.' Ex. 101 at 46, 48, 50, 54, 56, 58, 62, 63, 65, 68, 70, 72, 75, 76, 79.)

> It is the recommendation of the Directors' Subcommittee Fleming remain on Intensive Management status, and be reviewed in six months.  When informed of this recommendation, Fleming asked why.  He was told it was the result of the seriousness of the event he was involved in several years ago, and he is accountable for his actions at the time.

(Defs.' Ex. 101 at 89.)

In October or November 1998, the plaintiff came to know Bill Auxier, who is the athletic and recreation director at the Omaha Home for Boys.  The Omaha Home for Boys is a group home for males aged twelve to eighteen who, for various reasons, cannot stay at home or do not have a home.  The plaintiff's son, Joe, was a long-term resident at the Home, and he developed a close relationship with Mr. Auxier and his family.  Indeed, Mr. Auxier testified that after Joe completed the Home's five-level program, he lived with the Auxier family for a few years.  When Joe was sixteen years of age, he and Mr. Auxier began to visit the plaintiff at NSP once or twice per month.  Over time, the plaintiff and Mr. Auxier became friends.  In 1999, after Joe grew old enough to visit the plaintiff on his own, Mr. Auxier continued his visits and spoke with the plaintiff over the telephone.

Mr. Auxier testified that as time passed, he noticed a change in the plaintiff's attitude.  The plaintiff became more relaxed and light-hearted, and Mr. Auxier was impressed with the way that the plaintiff handled adversity.  The plaintiff's artwork became less dark: instead of pictures of dragons and skulls, the plaintiff began to send Mr. Auxier drawings of cartoon characters, animals, and landscapes.  (See Pl's Ex. 23.)  Mr. Auxier posted the plaintiff's drawings in his office and used them to start conversations about personal responsibility with young men at the Home.  A few youths corresponded with the plaintiff, with Mr. Auxier acting as an intermediary.  Mr. Auxier testified that it would be fair to consider the plaintiff to be a role model for the youths.

In the late 1990's or early 2000, NSP officials began a new incentive program designed to help curb disruptive behavior in the Control Unit.  The program–which was simply called the Control Unit Program (CUP)–consisted of a series of levels that an inmate could achieve by avoiding disciplinary write-ups for certain periods of time.  For example, an inmate could earn a cup (which he could use to drink from the sink in his cell), a comb, an extra bag of chips per

8

week, and extra visitation time as he progressed through the CUP.  In addition, inmates could earn permission to participate in activities with mental health staff.  Inmates who obtained this benefit were given worksheets to complete, and sometime later a mental health staff member would return to discuss the worksheets with the inmates.

The plaintiff testified that he began participating in the CUP program immediately upon its implementation, and he added that he found the mental health services to be helpful in his effort to change his behavior.  By June 8, 2001, the plaintiff completed all of the incentive levels in the CUP program, and he had received no misconduct reports for six years.  (See Defs.' Ex. 101 at 40, 44.)  Nevertheless, he remained on IM status in the segregation unit at NSP–although one of the members of the Director's Subcommittee recommended in July 2001 that the plaintiff be moved to AC.  (See id. at 44.)

Mr. Auxier noticed that despite the plaintiff's positive attitude and his progress in the CUP program, he remained on IM status.  Mr. Auxier began to write letters to prison officials with the hope that his views might be considered during the plaintiff's six-month status reviews.  After he decided that his efforts were not making a difference, he contacted a few state senators and attempted to persuade them to intervene in the plaintiff's case.  He also spoke with Fred Britten[11] and a representative from the ombudsman's office.[12]  Auxier testified that someone from the ombudsman's office told him that "basically . . . there's a certain amount of time that's going to have to happen and when that time is up, then he'll move on [out of IM]."

In December 2001–more than ten years after the failed escape attempt–the plaintiff was removed from IM status and placed on AC "due to [his] extended period of appropriate behavior and satisfactory program participation."  (Defs.' Ex. 101 at 37; see also id. at 30-36.)  Mr. Britten testified that although there are no set time limits for assignments to IM or AC, he believed that the length of the plaintiff's classification to IM status was appropriate "considering the seriousness of the incident that led to his placement in segregation" and his overall history of

---

[11]Mr. Britten was the deputy warden at NSP before he became the warden at TSCI in July 2000.

[12]Mr. Auxier could not say whether the ombudsman's office was a part of the Nebraska Department of Correctional Services.

9

violence.  Mr. Hopkins testified that "predicting someone's behavior is not something that folks in . . . our society have mastered, but what I do know is that one of . . . our best predictors of behavior is past behavior."  He added that he thought long and hard about Mr. Fleming's classification status, and that he ultimately believed that Mr. Fleming could move to general population if he maintained his good behavior over time.

The plaintiff testified that his living conditions in the NSP Control Unit after his reclassification to AC status were similar to the conditions he experienced as an IM inmate, except that he became eligible to have contact visits.  The plaintiff described these visits as "great," because he could hug his children and mother.  Mr. Auxier testified that his first contact visit with the plaintiff was "wonderful," and that "it was the first opportunity to hug, to talk, to just sit and chat, have a . . . pop and candy bar."

The plaintiff's classification status was reviewed again in May 2002.  (See Defs.' Ex. 101 at 20-29.)  The Director's Subcommittee determined that the plaintiff should remain on AC "because, due to the seriousness of the incident that led to [his] placement in segregation, [he] pose[s] a threat to the safety, security, and good order of the institution."  (Id. at 29.)

In August 2002, the plaintiff was transferred from the Control Unit at NSP to the Special Management Unit at TSCI, where he remained on AC status.  The plaintiff testified that the living conditions for AC inmates at TSCI were similar to the living conditions at NSP, with one important exception: at TSCI, inmates on AC status were not allowed contact visits.[13]  Indeed, even face-to-face visits were not permitted at TSCI.  Instead, visitors reported to the "gate house" at TSCI and communicated with inmates, who remained in the segregation unit wearing restraints, via video screens.

This change in visitation procedures was not the only disadvantage that confronted the plaintiff after his transfer to TSCI.  As noted above, the plaintiff's classification status was reviewed in May 2002, prior to the transfer.  The Addendum A prepared in connection with this

---

[13]The plaintiff also testified that at TSCI the yard was smaller and inmates generally spent their yard time alone.  In addition, at TSCI inmates could visit a law library and meet with medical staff without leaving the segregation building.  Apparently, inmates housed in the Control Unit at NSP moved outside the Control Unit for library and medical visits.

review, which is dated April 23, 2002, includes a description of the plaintiff's 1991 escape attempt; the injuries that were inflicted upon Mr. Fredrickson; the stabbing incident of January 15, 1992; and the fight of June 28, 1995. (See Pl.'s Ex. 5 at 2.) It also states,

> Inmate FLEMING has received no Misconduct Reports since October 9, 1995. His interaction with staff and other inmates has been appropriate. Inmate FLEMING is involved in the Control Unit Program (a Behavior Modification Program). He has successfully completed 102 consecutive weeks of the program and has achieved the highest incentive level. He has also successfully completed the total Mental Health Program offered to inmates who participate in the Control Unit Program

(Id.)[14] After the plaintiff's transfer to TSCI, this paragraph was deleted from the Addendum A documents that were prepared for his October 2002 classification review–although the summary of the 1991, 1992, and 1995 incidents remained virtually unchanged. (See id. at 3.) Furthermore, although TSCI maintained an incentive program similar to the CUP at NSP, the plaintiff's progress under the CUP was erased, and he had to "start everything all over" at TSCI.[15]

The plaintiff's next round of classification reviews commenced in April 2003. (See Defs.'s Ex. 101 at 7-13.) Although the plaintiff asked that his "positive accomplishments" be restored to the Addendum A, (see id. at 19), his request appears to have been disregarded, (see Pl.'s Ex. 5 at 4). On April 29, 2003, the Director's Subcommittee held a hearing to review the plaintiff's classification status.[16] The Subcommittee members were Donn Beaver, who currently serves as the assistant superintendent at the Community Corrections Center in Lincoln; Mel Rouf, who is the unit administrator at the Lincoln Correctional Center; and Dave Garrett, who is a "psychologist associate" at the Diagnostic and Evaluation Center. Mr. Beaver, who chaired the

---

[14]The assertion that the plaintiff "has received no Misconduct Reports since October 9, 1995, is contradicted later in the Addendum: "Since last seen by the Director's Subcommittee, Inmate FLEMING has received one (1) Misconduct Report, for which he received total sanctions of two (2) days Room Restriction upon release from Segregation." (Pl.'s Ex. 5 at 2.)

[15]Eventually, the plaintiff completed all of the levels of the TSCI incentive program.

[16]According to the plaintiff's testimony at trial, this hearing occurred on April 18, 2003. Documents in evidence, however, indicate that the hearing occurred on April 29, 2003. (See, e.g., Pl.'s Ex. 9, 10; Defs.' Ex. 101 at 12.)

hearing, complimented the plaintiff for avoiding trouble for so many years.  After Mr. Beaver spoke, the plaintiff felt that the hearing was going very well.  However, according to the plaintiff, Mr. Rouf then "basically called me an animal, said I was lower than an animal, that Max Frederickson was his friend . . . and he couldn't believe how a bunch of animals would . . . do that to his friend."

It appears to be true that Mr. Rouf had a close relationship with Mr. Fredrickson. However, the members of the Subcommittee each disputed the plaintiff's account of Mr. Rouf's exchange with the plaintiff.  Mr. Beaver agreed that Mr. Rouf opened a line of questioning about the assault upon Mr. Fredrickson, and he admitted that he was concerned with the direction of Mr. Rouf's questions.  However, he believed that Mr. Rouf simply wanted to ask the plaintiff why Mr. Fredrickson was so "viciously" attacked.  He added that Mr. Rouf did not curse at the plaintiff or call him an animal, and he thought that both Mr. Rouf and the plaintiff appeared to benefit from the conversation.  Indeed, Mr. Beaver recalled that the plaintiff thanked Mr. Rouf for giving him an opportunity to explain what happened during the escape attempt.  Mr. Rouf's testimony was consistent with Mr. Beaver's.  Mr. Rouf testified, "I told Mr. Fleming that I understood the physical assault on a staff member or even stabbing a staff member, but I couldn't comprehend why anybody would be so vicious as to burn someone and I asked him why they felt it was necessary to do that to Mr. Fredrickson."  He added that after the plaintiff responded to the question, he thanked Mr. Rouf for giving him the opportunity to talk about the escape attempt. Finally, Mr. Garrett testified that he thought that Mr. Rouf's exchange with the plaintiff was "professional," and "there was no name-calling."  After carefully considering the witness's testimony, I find that although Mr. Rouf did not call the plaintiff an animal during the April 2003 Subcommittee hearing, he did, at the least, strongly imply that the plaintiff was vicious.  I also find that the plaintiff expressed appreciation to Mr. Rouf for asking his questions about the assault upon Mr. Fredrickson.

After the hearing, the Subcommittee recommended that the plaintiff continue on AC for another six months.  (See Defs.' Ex. 101 at 7, 12.)  The plaintiff submitted an appeal to Harold Clarke, the Director of the Department, in which he argued that he did not get a fair hearing. (See Pl.'s Ex. 9 at 3.)  In a written response dated June 10, 2003, the Director stated,

In follow-up discussions with members of your April 29, 2003 Director's Subcommittee, I learned that in fact, discussion did occur in which Mr. Rouf acknowledges he did refer to having friendship with Max Fredrickson. Both Mr. Rouf and Director's Subcommittee Chair Donn Beaver recalled that you expressed appreciation for having the opportunity to explain specifics concerning your version of events involved with that incident.

While I do not believe this exchange between Mr. Rouf and you is grounds to question the objectivity and fairness of your hearing, I am nonetheless instructing staff to convene a separate Director's Subcommittee to again review your status on administrative confinement. It is my expectation that this review will be conducted in such a fashion that the appearance of objectivity will not be in question.

(See id. at 5.)[17]

The plaintiff received a new hearing before an entirely new Subcommittee on June 18, 2003; however, the new Subcommittee also determined that the plaintiff should remain in segregation for six months. (See Pl.'s Ex. 11.)

In the wake of these events, the plaintiff decided that his "best bet" to get out of administrative segregation would be to file a lawsuit. On August 20, 2003, he filed a complaint in this court alleging, among other things, that his confinement in segregation for twelve years amounted to cruel and unusual punishment. (See Compl., filing 1.)

In January 2004, without notice or any indication that the plaintiff's status had been reviewed by a classification committee, the plaintiff was removed from AC status and placed within the general population at TSCI. The plaintiff testified that since his transfer to general population, he is able to see visitors more often, make phone calls every day, shower two or three times per day, and participate in group activities. He has greater access to art supplies, and he has been playing bass guitar in a band with other inmates. However, he testified that he has found it hard to adjust to being around people, and he prefers to keep to himself.

Sometime last year, the plaintiff received a request for a meeting from Mr. Fredrickson. The plaintiff agreed to the request, and a meeting was arranged through the Department's victim-offender program. The plaintiff described the meeting as "a good thing," and he stated that he

---

[17]It appears that the letter was signed on behalf of Director Clarke by Frank Hopkins. (See Ex. 9 at 5.)

used the meeting as an opportunity to apologize to Mr. Fredrickson.  In addition, Mr. Rouf testified that Mr. Fredrickson had come to forgive the plaintiff for his role in the attack.

## B.   The Medical Treatment Provided to the Plaintiff

The plaintiff testified that he began to experience pain in his right knee in 1999.  He attributed the pain to the fact that he spend a great deal of time sitting cross-legged on the slab in his cell and "walking in the same circle out on the yard all the time."  By 2001, his knee began to swell.  In early 2002, the plaintiff was scheduled for knee surgery after an MRI examination revealed a cyst and other damage.  (See Pl.'s Ex. 1 at 1-2.)  Ten days after the surgery, the plaintiff was returned to the Control Unit with instructions to exercise his knee.[18]

The swelling in the plaintiff's knee did not recede, and another MRI performed "a month or two" after the surgery indicated that the cyst had returned.  (See Pl.'s Ex. 1 at 3.)  A second surgery was performed and, on the following day, the plaintiff was returned to the Control Unit with instructions that he should not move his leg for a week.

A "medical hold" had been placed on the plaintiff due to his knee problems.  After the hold was released, the plaintiff was transferred from the NSP Control Unit to the TSCI Special Management Unit.  Upon his arrival at TSCI, the plaintiff contacted the medical staff in the Special Management Unit to discuss his knee, which was becoming more painful.  The medical staff examined the plaintiff and concluded that the cyst had probably returned.  A Dr. Williams, who was a member of the medical staff at TSCI, treated the plaintiff's knee with cortisone shots and told the plaintiff that he needed a metal brace to stop the "shifting" in his knee.[19]  Instead of a metal brace, however, the plaintiff received knee sleeves that were either too small to fit over his calf or too large to stabilize his knee.

The plaintiff submitted a number of written complaints about his treatment to Dr.

_____

[18]The plaintiff did not have access to exercise equipment, either in his cell or on the yard. He was advised to raise his knee and do "knee bends" for exercise.

[19]The plaintiff testified that the medical staff also gave him ibuprofen to combat the pain in his knee, but he informed the staff that he could not take the ibuprofen because he suffers from cirrhosis of the liver.  (See Pl.'s Ex. 2 at 3.)  Dr. Dennis Bozarth, the plaintiff's expert medical witness, confirmed that a person with a liver impairment would have to monitor his use of "regular" anti-inflammatories.  (See Pl's Ex. 17, Bozarth Dep. at 17.)

Williams and the medial staff.  (See Pl.'s Ex. 2.)  Dr. Randy Kohl, Correctional Medical Service's Chief Medical Officer, responded to the plaintiff's complaints in a letter dated May 22, 2003.  (See Pl.'s Ex. 3.)  In this letter, Dr. Kohl agreed that a metal knee brace would provide more support for the plaintiff's knee; however, he informed the plaintiff that metal knee braces were not permitted in the Special Management Unit at TSCI.  (See id.)  Warden Britten confirmed that inmates in AC are "typically not" allowed to possess metal items because they "can be used to cause harm to other persons or . . . to cause disruption within the unit."  He added that the prison staff would work with the medical staff to come up with an acceptable treatment substitute.

I have been referred to no written rule indicating that medical appliances containing metal are banned in the Department's segregation units; however, TSCI Segregation Unit Operations Operational Memorandum number 210.01.01(revised March 27, 2003) states, at Part III.A,

> Inmates will receive all prescribed medication unless there is an imminent danger that the inmate will abuse the medication or induce self-injury.  As a general matter, medications and other prescribed materials (back braces, prosthetic appliances, etc.) may only be restricted with the concurrence of Correctional Medical Service's Chief Medical Officer.

(Pl.'s Ex. 13 at 3.)

After the plaintiff was moved to general population at TSCI, he received a metal brace that did not fit his leg.  At some point, he did receive a brace from Dr. Williams that relieved some of the pressure on his knee; however, this brace was not replaced when it wore out.  The plaintiff testified that a few months before trial, "an orthopedic guy from someplace in Lincoln" measured his leg for a brace, but a new brace has not yet been provided to him.  He added that his knee ailment has caused him to develop additional health problems, including a limp, ankle pain, and varicose veins.

Dr. Dennis Bozarth, a physician with board certification in orthopaedic surgery, reviewed a box of medical records concerning the plaintiff's knee and concluded that the plaintiff has

suffered from torn cartilage in his knee, "popliteal or Baker's cysts,"[20] and arthrosis.[21] (Pl.'s Ex. 17, Bozarth Dep. at 6-7, 13-14.) He stated that the plaintiff's problems are relatively common, though he noted that such problems typically appear in patients who are nearly seventy years of age. (See id. at 9-10.) Dr. Bozarth outlined the typical course of treatment for persons with conditions such as the plaintiff's. First, patients are given anti-inflammatory medication and advised to exercise. (See id. at 16-17.) Exercises that strengthen the knee and promote weight loss, such as biking, water aerobics, elliptical training, and weight lifting, are especially beneficial. (See id.) If these treatments fail, patients are given cortisone shots. (See id. at 18.) Dr. Bozarth stated that in contrast to the anti-inflammatory medications used during the first stage of treatment, cortisone is a steroidal anti-inflammatory that can provide more powerful relief. (See id. at 18-19.) Next, if cortisone shots are ineffective, hyaluronic acid supplementation might be attempted. (See id. at 19.) Hyaluronic acid supplementation involves a series of injections–one shot per week for five weeks–that are designed to "lube up the joints" with "a synthetic form of the natural oil of the knee." (Id. at 19, 20.) However, hyaluronic acid supplementation can cost as much as surgery, and it must be repeated every six months. (See id. at 21.) At the next stage of treatment, patients may be given braces or canes to help them "continue to function." (Id. at 22.) Dr. Bozarth stated that a rigid fiberglass or metal brace, called an "unloader brace," can straighten the knee and thereby remove the load from the knee's arthritic side. (See id. at 22-23.) Although such braces can be effective, Dr. Bozarth stated that they are uncomfortable and tend to wear out. (See id. at 23.) After braces have been tried, patients under the age of sixty may consider a procedure called "osteotomy," which involves breaking the patient's leg to correct its alignment. (See id. at 23-25.) Osteotomies tend to be unpopular with patients, however, because the recovery period may last up to three months. (See id. at 25-26.) Finally, the condition can be treated with knee replacement surgery. (See id.) Dr. Bozarth indicated that ideally, knee replacements should be delayed until patients reach the age

---

[20]Dr. Bozarth described a Baker's cyst as "a fluid -filled pocket out [on] the back side of the knee" that acts as a reservoir for excess knee fluid. (Pl.'s Ex. 17, Bozarth Dep. at 36.)

[21]Dr. Bozarth described arthrosis as a "wear phenomenon where that smooth cartilage deteriorates and wears off, and it wears down to the bone." (Pl.'s Ex. 17, Bozarth Dep. at 12.)

of seventy or seventy-five.  (<u>See</u> <u>id.</u> at 27.)  He added, however, that he has performed knee replacements for patients in their thirties.  (<u>See</u> <u>id.</u>)

Dr. Bozarth stated that in the plaintiff's case, a knee replacement should be delayed as long as possible due to the risk of infection and other complications.  (Pl.'s Ex. 17, Bozarth Dep. at 29-31.)  In addition, Dr. Bozarth was asked the following question, and he gave the following answer:

> Q.    Is there any point up to this place where you would observe that Mr. Fleming is not getting what constitutes the current standard of care for the condition he has as you understand it?
>
> A.    No.

(<u>Id.</u> at 42.  <u>See also</u> <u>id.</u> at 50; <u>id.</u>, Dep. Ex. 1, Bozarth Letter at 1 ("As far as I can see, again from what we have to review, appropriate treatment has been done.").)

## II.    STANDARD OF REVIEW

"[T]he conditions under which [a prisoner] is confined are subject to scrutiny under the Eighth Amendment."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993).  The Eighth Amendment prohibits punishments that "'involve the unnecessary or wanton infliction of pain,' or are grossly disproportionate to the severity of the crime."  <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981) (citations omitted).  "[A] prison official violates the Eighth Amendment only when two requirements are met."  <u>Farmer</u>, 511 U.S. at 834.  <u>See also</u> <u>Brown v. Nix</u>, 33 F.3d 951, 955 (8th Cir. 1994).  "First, the deprivation alleged must be, objectively, 'sufficiently serious' . . . ."  <u>Farmer</u>, 511 U.S. at 834 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)).  That is, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities."  <u>Id.</u> (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)).  "At a minimum, these life necessities include adequate food, clothing, shelter, medical care and personal safety."  <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1260 (N.D. Cal. 1995) (citing, <u>inter alia</u>, <u>Farmer</u>, 511 U.S. at 832).  This standard is not fixed, however, but varies with "the evolving standards of decency that mark the progress of a maturing society."  <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981) (quoting <u>Trop v. Dulles</u>, 356

U.S. 86, 101 (1958)).  For example, courts have recognized that "conditions that inflict serious mental pain or injury also implicate the Eighth Amendment."  Madrid, 889 F. Supp. at 1260 (citations omitted); Scher .v Engelke, 943 F.2d 921, 924 (8th Cir. 1991) ("[E]vidence of fear, mental anguish, and misery inflicted through frequent retaliatory cell searches . . . could suffice as the requisite injury for an eighth amendment claim."); Rogers v. Thomas, 879 F.2d 380, 384 (8th Cir. 1989) ("In order to establish an eighth amendment violation after incarceration, a prisoner must establish the unnecessary and wanton infliction of pain, mental or physical.").  In addition, the length of confinement is a factor that must be considered, along with the totality of the conditions of the confinement, to determine whether the conditions meet constitutional standards.  In other words, conditions of confinement that are tolerable in the short term may become "cruel and unusual" over a prolonged period.  Hutto v. Finney, 437 U.S. 678, 686 (1978).  See also Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989) ("Any analysis of confinement conditions must be based on the totality of the circumstances.").

Second, the plaintiff must establish that the prison official acted with a "sufficiently culpable state of mind."  Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297).  This "sufficiently culpable state of mind" has been termed "wantonness," but the precise meaning of wantonness varies based upon "differences in the kind of conduct against which an Eighth Amendment objection is lodged."  Wilson, 501 U.S. at 302 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).  For example, in cases based upon prison officials' use of force to restore order during prison disturbances, officials must act "in haste [and] under pressure" to respond to the emergency, and their actions are "balanced against 'competing institutional concerns for the safety of prison staff or other inmates.'"  Id. (quoting Whitney, 475 U.S. at 320).  In these cases, "wantonness consist[s] of acting 'maliciously and sadistically for the very purpose of causing harm.'"  Id. (quoting Whitley, 475 U.S. at 320-21).  "In contrast, 'the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities,' so in that context . . . 'deliberate indifference' would constitute wantonness."  Id. (quoting Whitley, 475 U.S. at 320).  Deliberate indifference is "a state of mind more blameworthy than negligence," but it is "something less than [acting or failing to act] for the very purpose of causing harm or with knowledge that harm will result."  Farmer, 511 U.S. at

18

835.  Deliberate indifference will be found to exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.

The Supreme Court has held that the "deliberate indifference" standard, as opposed to the high "malicious and sadistic" standard, applies not only in cases involving alleged deprivations of medical care, but also in cases alleging inadequate or inhumane conditions of confinement.  Wilson, 501 U.S. at 303; see also Farmer, 511 U.S. at 835-36.

## III.   ANALYSIS

### A.   Whether the Plaintiff's Twelve-year Confinement in Administrative Segregation Violated the Eighth Amendment

The plaintiff argues that his extended confinement in administrative segregation at NSP and TSCI violated the Eighth Amendment.  Specifically, he claims that he was kept "in the hole" for personal reasons; that his classification reviews were "shams"; and that he should have been returned to the general population in 1998 because, based upon the experience of another inmate who caused bodily harm during an escape, he expected to spend only seven or eight years in segregation.  He also states that since his return to the general prison population, he finds it difficult to be around people and he prefers to be alone.

Preliminarily, I note that the plaintiff's arguments appear to raise Fourteenth Amendment concerns.  (See Pl.'s Trial Br., filing 96, at 1, 4-7.)  See also Sandin v. Conner, 515 U.S. 472, 484-86 (1995); Phillips v. Norris, 320 F.3d 844, 846-47 (8th Cir. 2003) (describing elements of due process claim based upon confinement in segregation).  Although the complaint does allege that the plaintiff's due process rights were violated by the defendants' actions, (see compl., filing 1, at 3), the complaint has been superceded by the joint pretrial order, which states that the plaintiff's claims are based solely upon the Eighth Amendment, (see filing 92 at 2-3).  In other words, claims based upon the plaintiff's due process rights are not properly before me.

As stated above, "To establish an Eighth Amendment violation, a prisoner must show that the alleged deprivation, viewed objectively, is 'sufficiently serious' and that the prison officials'

actions, viewed subjectively, demonstrate a 'deliberate indifference' to the prisoner's health or safety. Rahman X v. Morgan, 300 F.3d 970, 974 (8th Cir. 2002) (quoting Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998)); Brown v. Nix, 33 F.3d 951, 955 (8th Cir. 1994). I find that the plaintiff's claim fails because he has failed to prove that he suffered from a "sufficiently serious" deprivation.

A deprivation is "sufficiently serious" if it denies a prisoner the "minimum civilized measures of life's necessity," which include adequate food, clothing, shelter, medical care and personal safety. Farmer v. Brennan, 511 U.S. 825, 832 (1994); Simmons v. Cook, 154 F.3d 805, 807 (8th Cir. 1998). The plaintiff does claim that he was denied adequate medical care, and I shall address this claim separately below. (See infra Part III.B.) That aside, to the extent that the plaintiff claims that his twelve-year confinement in administrative segregation, in and of itself, amounted to a "sufficiently serious" deprivation, his claim must be rejected. There is simply no evidence that the basic conditions that the plaintiff experienced in administrative confinement, alone or in combination, "produce[d] the deprivation of a single, identifiable human need such as food, warmth, or exercise." Wilson v. Seiter, 501 U.S. 294, 304 (1991). See also id. at 305 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."); Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994). This is true even when the length of the plaintiff's confinement in administrative segregation is taken into account. See Herron v. Schriro, 11 F. App'x 659, 662 (8th Cir. 2001) (affirming district court's holding that a term of approximately fifteen years in administrative segregation was not a sufficiently serious deprivation to support an Eighth Amendment claim); Brown v. Nix, 33 F.3d 951, 953, 955 (8th Cir. 1994) (holding that nine-year confinement in segregation did not violate the Eighth Amendment).

The plaintiff testified that he has been psychologically injured by his term in administrative segregation; specifically, he states that he has found it difficult to adjust to being around other people, presumably because of the isolated conditions that he faced for over twelve years. Conditions that are injurious to an inmate's mental health can form the basis of an Eighth Amendment claim, see, e.g.,; Scher .v Engelke, 943 F.2d 921, 924 (8th Cir. 1991) (citing cases); Madrid v. Gomez, 889 F. Supp. 1146, 1260-61 & n.202 (N.D. Cal. 1995) (citing cases); Ruiz v.

20

Johnson, 37 F. Supp. 2d 855, 907-11, 913-15 (S.D. Tex. 1999) rev'd in part, 243 F.3d 941 (5th Cir. 2001), and it is certainly true that the plaintiff's opportunities to talk with others were significantly restricted while he was in administrative segregation.  However, it is also true that these restrictions were not so severe as to prevent the plaintiff from developing a close friendship with Mr. Auxier.  I note too that the plaintiff made no complaint about the quantity of visitation (or other social time) that he was allotted–though he clearly did work very hard to earn the more intimate contact visits.  In addition, although I credit the plaintiff's testimony that he has been uncomfortable around other people since his return to the general population, his participation in a band suggests that he can overcome his social discomfort.  Finally, the testimony of several witnesses, including Mr. Auxier and the plaintiff himself, indicates that the plaintiff improved his psychological well-being, largely through his own efforts, during his administrative confinement. Based upon the evidence before me, I find that the plaintiff did not suffer a psychological deprivation "sufficiently serious" to support an Eighth Amendment claim.

The plaintiff has submitted for my consideration a report that advocates limits on the use of segregated confinement in prisons.  (See Pl.'s Ex. 21, Commission on Safety and Abuse in America's Prisons, Confronting Confinement 19-20, 52-61 (Vera Institute of Justice 2006).) This report states that segregation has been overused, that "regular and meaningful human contact" should be allowed, and that in some cases prisoners are left in "tortuous conditions." (Id. at 52, 58.)  It also cites a study that identified "a constellation of symptoms that includes overwhelming anxiety, confusion and hallucination, and sudden violent and self-destructive outbursts" among "a small group of Massachusetts prisoners who had been serving in isolation." (Id. at 58.)  Although the report presents compelling policy arguments concerning the use of segregation units, it does not establish that the plaintiff suffered a sufficiently serious deprivation during his time in administrative segregation.

Since there is no evidence that the plaintiff suffered a "sufficiently serious" deprivation, the plaintiff's claim necessarily fails, and I need not determine whether the defendants conducted sham reviews, kept the plaintiff in administrative segregation for personal reasons, or took other actions that demonstrate deliberate indifference to the plaintiff's health or safety.  Judgment shall be entered in favor of the defendants on the plaintiff's claim that his twelve-year confinement in

administrative segregation violated the Eighth Amendment.[22]

### B.   Whether the Plaintiff Was Denied Adequate Medical Care in Violation of the Eighth Amendment

The plaintiff also claims that he received inadequate medical treatment for his right knee, and that this lack of treatment amounted to cruel and unusual punishment in violation of the Eighth Amendment.  To prevail on this claim, the plaintiff must prove that the defendants were deliberately indifferent to his serious medical needs.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 106 (1976); Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995).

"A medical condition does not need to be an emergency in order to be considered serious under Estelle."  Oldham v. Chandler-Halford, 877 F. Supp. 1340, 1354 (N.D. Iowa 1995) (citing Ellis v. Butler, 890 F.2d 1001, 1003 n.1 (8th Cir. 1989)).  The Eighth Circuit has held that a "serious medical need" may properly be defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  Id. (quoting Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1992)).  I find that the plaintiff's knee ailment, which has been diagnosed by physicians as requiring treatment, amounts to a serious medical need for Eighth Amendment purposes.

However, the plaintiff has failed to prove that the defendants were deliberately indifferent to his serious medical need.  As noted above, deliberate indifference is "a state of mind more blameworthy than negligence," and it will be found to exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 835, 847 (1994).  In this case, the

---

[22]One additional matter concerning the conditions of the plaintiff's confinement merits attention.  There is uncontroverted evidence that in the immediate aftermath of the plaintiff's escape attempt, the plaintiff suffered harassment and physical abuse at the hands of guards at NSP.  However, the plaintiff has not argued that these incidents amounted to cruel and unusual punishment in violation of the Eighth Amendment.  Furthermore, the names of the persons involved in these incidents have not been revealed, and there is no evidence that any named defendant had knowledge of the incidents or participated in them in any way.  Under the circumstances, I cannot find the defendants liable for an Eighth Amendment violation predicated upon the conditions of the plaintiff's confinement shortly after his escape attempt.

plaintiff's knee was treated with two surgeries and cortisone injections, but he did not receive a metal knee brace, and he was provided with anti-inflammatory medication that he could not take without risking injury to his liver.  Although the plaintiff's treatment was not optimal, and although there is evidence that treatments such as osteotomy and knee replacement surgery have not been tried, it is undisputed that the plaintiff has received treatment is consistent with the current standard of care.  Under these circumstances, I find that the defendants did not act with deliberate indifference to the plaintiff's serious medical needs.

**IT IS THEREFORE ORDERED** that judgment shall be entered in favor of the defendants.

Dated October 18, 2006.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge

23